ORAL ARGUMENT NOT YET SCHEDULED

*Appeal No. 14-7193*

IN THE

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

⟶⟶◄◄

SUSAN WEINSTEIN, individually as Co-Administrator of the Estate of Ira William Weinstein, and as natural guardian of plaintiff DAVID WEINSTEIN (minor); JEFFREY A. MILLER, as Co-Administrator of the Estate of Ira William Weinstein; JOSEPH WEINSTEIN; JENNIFER WEINSTEIN HAZI; DAVID WEINSTEIN, minor, by his guardian and next friend SUSAN WEINSTEIN,

*Plaintiffs-Appellants.*

*v.*

ISLAMIC REPUBLIC OF IRAN; IRANIAN MINISTRY OF INFORMATION AND SECURITY; AYATOLLAH ALI HOSEINI KHAMENEI, Supreme Leader of the Islamic Republic of Iran; ALI AKBAR HASHEMI-RAFSANJANI, Former President of the Islamic Republic of Iran; ALI FALLAHIAN-KHUZESTANI, Former Minister of Information and Security,

*Defendants,*

*and*

INTERNET CORPORATION FOR ASSIGNED NAMES AND NUMBER,

*Appellee.*

_____

Consolidated with 14-7194, 14-7195, 14-7198,
14-7202, 14-7203 and 14-7204
_____

*On Appeal from the United States District Court
for the District of Columbia*

## BRIEF FOR PLAINTIFFS-APPELLANTS

Steven T. Gebelin                 Robert J. Tolchin
Scott M. Lesowitz                 Meir Katz
RAINES FELDMAN LLP               THE BERKMAN LAW OFFICE, LLC
9720 Wilshire Boulevard, 5th Floor   111 Livingston Street, Suite 1928
Beverly Hills, California 90212    Brooklyn, New York 11201
310-440-4100                      718-855-3627

*Attorneys for Plaintiffs-Appellants*

Pursuant to Circuit Rule 28(a)(1), Plaintiffs-Judgment Creditors-Appellants Weinstein *et al*. ("Plaintiffs") hereby file the following certificate of parties, rulings, and related cases.

**(A) Parties and Amici.**   The following is a list of persons who are known to be parties to this case at this time:

Plaintiffs: Susan Weinstein, individually as Co-Administrator of the Estate of Ira William Weinstein, and as natural guardian of plaintiff D.W.; Jeffrey A. Miller, as Co-Administrator of the Estate of Ira William Weinstein; Joseph Weinstein; Jennifer Weinstein Hazi; D.W., minor, by his guardian and next friend Susan Weinstein; Shaul Stern, individually and as legal representative of the Estate of Leah Stern; Joseph Stern; Shimson Stern; Yocheved Kushner; Jenny Rubin; Deborah Rubin; Daniel Miller; Abraham Mendelson; Stuart Elliot Hersh; Renay E. Frym; Noah Rozenman; Elena Rozenman; Tzvi Rozenman; Seth Charles (Klein) Ben Haim; Bernard (Klein) Ben Haim; Lavi (Klein) Ben Haim; Ruth Calderon-Cardona; Luz Calderon-Cardona; Luis Calderon-Cardona; Gloria Calderon-Cardona; Jose Raul Calderon-Cardona; Ana Delia Calderon-Cardona; Hilda Calderon-Cardona; Angel Calderon-Guzman; Miguel Calderon-Guzman; Salvador Calderon-Martinez; Pablo Tirado-Ayala; Antonia Ramirez-Fiero; Mary Nell Wyatt, individually and as executrix of the Estate of Ronald E. Wyatt; Daniel Wyatt; Amanda Lippelt; Michelle Brown; Marvin T. Wilson; Renetta Wilson; Marty R. Wilson; Gina R. Brown;

Bradley G. Key; Kimi L. Johns; and Barry T. Key. None of the Plaintiffs has a parent company and no publicly-held company has a 10% ownership interest in any of the Plaintiffs.

Defendants-Judgment Debtors: The following were Defendants in their respective underlying cases, but did not participate before the district court in this action and are not parties to this appeal: The Islamic Republic Of Iran; The Iranian Ministry of Information and Security; Ayatollah Ali Hoseini Kharnenei, Supreme Leader of the Islamic Republic of Iran; Ali Akbar Hashemi-Rafsanjani, Former President of the Islamic Republic of Iran; Ali Fallahian-Khuzestani, Former Minister of Information and Security; Palestine Islamic Jihad, also known as Palestine Islamic Jihad-Shaqaqi Faction, also known as, Palestinian Islamic Jihad, also known as, Islamic Jihad Of Palestine, also known as Harakat Al-Jihad Al-Islami Al-Filastini; The Democratic People's Republic Of Korea; The Cabinet General Intelligence Bureau; and the Syrian Arab Republic.

Third Party Garnishees-Appellees: Internet Corporation for Assigned Names and Numbers.

Intervenors & *Amici*: There were no intervenors or *amici* before the District Court and no intervenors or *amici* have appeared before this Court.

 **(B) Rulings Under Review.**    The rulings under review are the District Court's Orders in each of these seven consolidated cases by Judge  Royce C.

Lamberth of the U.S. District Court for the District of Columbia (in *Weinstein*, docket entry 112) and the accompanying memorandum opinion (in *Weinstein*, docket entry 113), both dated November 10, 2014. The Order is reproduced at pages 63-65 of the Appendix. The Memorandum Opinion is reproduced at pages 66-73 of the Appendix and published as *Stern v. Islamic Republic of Iran*, 73 F. Supp. 3d 46 (D.D.C. 2014). The Order quashed Plaintiffs' writs of attachment to third party the Internet Corporation for Assigned Names and Numbers and denied as moot Appellants' related motion for discovery and scheduling relief.

    **(C) Related Cases.**    The underlying cases supporting Appellants' judgment collection activity at issue in this appeal, D.D.C. case numbers 02-cv-01811, 08-cv-00502, 14-mc-00648, 08-cv-00520, 00-cv-02602, 01-cv-01655, and 00-cv-02601, and D.P.R. case number 08-cv-01367, have been the subject of various appeals and enforcement actions not directly related to this one. There are no other related cases.

# **Table of Contents**

CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES.................*i*

TABLE OF AUTHORITIES ................................................................ *vi*

GLOSSARY....................................................................................... *xi*

JURISDICTIONAL STATEMENT ...................................................... 1

ISSUES PRESENTED........................................................................ 1

STATUTORY AUTHORITY ............................................................... 2

STATEMENT OF FACTS .................................................................. 2

    A.   The Attached Assets ................................................................. 3

        1.   IP Addresses................................................................ 3

        2.   Country-Code Top Level Domains............................... 7

    B.   ICANN's Role as Garnishee of the Attached Assets ................. 9

        1.   The IP Addresses of Iran, North Korea, and Syria ......... 11

        2.   Iran's Country-Code Top Level Domains....................... 12

        3.   North Korea's Country-Code Top Level Domains.......... 13

        4.   Syria's Country-Code Top Level Domains...................... 14

    C.   Procedural History.................................................................. 15

SUMMARY OF ARGUMENT ........................................................... 21

STANDARD OF REVIEW ................................................................ 22

ARGUMENT

    I.   The District Court Erred in Determining that the Attached Internet Assets are Not Subject to Attachment under District of Columbia Law ....................................................................................... 23

        A.   Applicable District of Columbia Law Demonstrates that the Internet Assets are or Might be Attachable...................... 23

B. The Statutes of California and Minnesota, Both of Which Allow Attachment of Domain Names, are More Similar to D.C. CODE § 16-544 than are Virginia's Statutes ............................ 27

C. Virginia's *Umbro* Decision is Inapposite ......................................... 32

D. Virginia's *Umbro* Decision is Erroneous or Incomplete in its Reasoning ..................................................................... 36

E. The District of Columbia Court of Appeals Would be Very Unlikely to Follow *Umbro* .................................................. 37

F. No Decision of the District of Columbia Court of Appeals Supports the District Court's Holding ................................ 38

II. The District Court's Refusal to Allow Discovery was an Abuse of Discretion ..................................................................... 42

III. Remand Requires only that D.C. CODE § 16-544 *Might* Permit Attachment of the Judgment Debtor's Internet Assets ........................... 43

IV. The District of Columbia Court of Appeals Should Have the Opportunity to Opine on these Important Questions of First Impression under District of Columbia Law ................................ 44

CONCLUSION ..................................................................... 48

CERTIFICATE OF COMPLIANCE

STATUTORY ADDENDUM ............................................................. a1

# **Table of Authorities**

## **Cases**

*Beil v. Lakewood Eng'g & Mfg. Co.*,
    15 F.3d 546 (6th Cir. 1994) ........................................................ 42

*Conesco Indus., Ltd. v. Conforti & Eisele, Inc., D. C.*,
    627 F.2d 312 (D.C. Cir. 1980) .................................................... 26

*Cummings General Tire Co. v. Volpe Construction Co.*,
    230 A.2d 712 (D.C. 1967) ......................................................38-40

*In re EBC I, Inc.*,
    356 B.R. 631 (Bankr. D. Del. 2006) ........................................... 32

*Famology.com, Inc. v. Perot Sys. Corp.*,
    158 F. Supp. 2d 589 (E.D. Pa. 2001) .......................................... 25

*Goldberg v. Southern Builders*,
    184 F.2d 345 (D.C. Cir. 1950) .................................................... 24

*Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.*,
    944 F.2d 940 (D.C. Cir. 1991) .................................................26-27

*Jackson v. United States*,
    819 A.2d 963 (D.C. 2003) .......................................................25-26

\* *Kremen v. Cohen*,
    337 F.3d 1024 (9th Cir. 2002) ...........................20, 25, 28, 46-47

*Kremen v. Cohen*,
    99 F. Supp. 2d 1168 (N.D. Cal. 2000) ........................................ 35

*Lapsley v. Xtek, Inc.*,
    689 F.3d 802 (7th Cir. 2012) ...................................................... 43

*Narouz v. Charter Commc'ns, LLC*,
    591 F.3d 1261 (9th Cir. 2010) .................................................... 43

\* Authorities upon which we chiefly rely are marked with asterisks.

\* *Nationwide Mut. Ins. Co. v. Richardson*,
    270 F.3d 948 (D.C. Cir. 2001)............................................................45-46

    *Nationwide Mut. Fire Ins. Co. v. Wilbon*,
    960 F. Supp.2d 263 (D.D.C. 2013)............................................................ 26

\* *Network Solutions, Inc. v. Umbro*,
    529 S.E.2d 80 (Va. 2000) ................................................................30-38

\* *Office Depot, Inc. v. Zuccarini*,
    596 F.3d 696 (9th Cir. 2010) ..........................................................28, 47

\* *Rowe v. Colpoys*,
    137 F.2d 249 (D.C. Cir. 1943)......................................................24-25, 28

    *SafeCard Servs., Inc. v. S.E.C.*,
    926 F.2d 1197 (D.C. Cir. 1991).............................................................. 42

    *Schreiber v. Soc'y for Sav. Bancorp, Inc.*,
    11 F.3d 217 (D.C. Cir. 1993)................................................................. 42

    *Schuchart v. La Taberna Del Alabardero, Inc.*,
    365 F.3d 33 (D.C. Cir. 2004).................................................................. 46

    *Sherrod v. Lingle*,
    223 F.3d 605 (7th Cir. 2000) ................................................................. 42

    *Shpritz v. Dist. of Columbia*,
    393 A.2d 68 (D.C. 1978) ....................................................................41-42

\* *Sprinkler Warehouse, Inc. v. Systematic Rain, Inc.*,
    859 N.W.2d 527 (Minn. Ct. App. 2015) ..................................29, 36-37, 47

    *Teltschik v. Williams & Jensen, PLLC*,
    748 F.3d 1285 (D.C. Cir. 2014)............................................................. 22

    *Thomas v. City Lights Sch., Inc.*,
    124 F. Supp. 2d 707 (D.D.C. 2000)......................................................... 27

    *Tuite v. Henry*,
    98 F.3d 1411 (D.C. Cir. 1996)..........................................................23, 42

*United States v. Edmond,*
  924 F.2d 261 (D.C. Cir. 1991)....................................................27

*United States v. Thornton,*
  672 F.2d 101 (D.C. Cir. 1982)....................................................45

*W. Elec. Co. v. Piezo Tech., Inc.,*
  860 F.2d 428 (Fed. Cir. 1988) ...................................................42

*Williams v. Johnson,*
  776 F.3d 865 (D.C. Cir. 2015)....................................................22

* *Xereas v. Heiss,*
  933 F. Supp. 2d 1 (D.D.C. 2013)................................................25

## **Statutes and Rules**

28 U.S.C.:
  § 1291 ..............................................................................1
  § 1330 ..............................................................................1
  § 1331 ..............................................................................1
  § 1332 ..............................................................................1
  § 1605(a)(7) .....................................................................1
  § 1605A ...........................................................................1
  § 1610 .................................................................1-2, 41, a3

Terrorism Risk Insurance Act of 2002 § 201 ("TRIA"),
  codified as a note to 28 U.S.C. § 1610 ...........................1-2, a3

Fed R. App. P. 27 .................................................................44

Fed. R. Civ. P. 69 .................................................................1

CAL. CIVIL PROCEDURE CODE:
  § 695.010(a) ...........................................................27-28, a5
  § 699.710 ..............................................................27-28, a5

D.C. CODE:
  § 11-723 ..................................................................44-45

∗  § 16-544 ............................... 1-2, 21-23, 25, 27-29, 31, 36-38, 40, 44-47, a5
   § 45-401 ................................................................................... 26

Minn. Stat. § 571.73, subd. 3(3) ........................................ 29, 37, a5

Virginia Code:
   § 8.01-474 ...................................................................... 29, a6
   § 8.01-478 ...................................................................... 29, a6
   § 8.01-511 ...................................................................... 30-31, a6

## Other Authority

19 Fed. Prac. & Proc. Juris. § 4507 .................................................. 26

Black's Law Dictionary 715 (8th ed. 2004) ........................................ 23-24

Steve Crocker et al.,
   Security and Other Technical Concerns Raised by the DNS
   Filtering Requirements in the PROTECT IP Bill 15 (2011),
   http://domainincite.com/docs/PROTECT-IP-Technical-Whitepaper-
   Final.pdf ........................................................................................ 7

Iljitsch van Beijnum,
   *With the Americas running out of IPv4, it's official: The Internet is full*,
   ARS Technica, June 12, 2014, http://arstechnica.com/information-
   technology/2014/06/with-the-americas-running-out-of-ipv4-its-
   official-the-internet-is-full/ ........................................................ 4-5

IANA:
   Delegation Record for .IR, Mar. 24, 2015, http://www.iana.org/
   domains/root/db/ir.html ............................................................ 12

   Delegation Record for .KP, July 18, 2011, http://www.iana.org/
   domains/root/db/kp.html .......................................................... 13

   Redelegation of the .KP domain representing the Democratic People's
   Republic of Korea to Star Joint Venture Company, Apr. 1, 2011, http://
   www.iana.org/reports/2011/kp-report-20110401.html ........................... 13

Report on the Delegation of the ایران ("Iran") domain representing the
Islamic Republic of Iran in Arabic, Sept. 13, 2013, http://
www.iana.org/reports/2013/iran-report-20130913.html .......................... 12

ICANN:

IDN ccTLD Fast Track String Evaluation Completion,
https://www.icann.org/resources/pages/string-evaluation-completion-
2014-02-19-en ........................................................................................ 14

Contract bet. U.S. Dept. of Commerce and ICANN, July 29, 2012,
http://www.ntia.doc.gov/files/ntia/publications/sf_26_pg_1-2-final_
award_and_sacs.pdf .............................................................................. 9-10

ISO,
Online Browsing Platform, UM, https://www.iso.org/obp/ui/#iso:code:
3166:UM ..................................................................................................... 8

Wikipedia:

IPv4 Address Exhaustion, https://en.wikipedia.org/wiki/
IPv4_address_exhaustion ......................................................................... 4

United States Minor Outlying Islands, https://en.wikipedia.org/wiki/
United_States_Minor_Outlying_Islands .................................................. 8

# Glossary

| **Abbreviation** | **Meaning** |
| --- | --- |
| DNS | Domain Name System (or Service or Server). The DNS is a system that translates easily memorized alphabetic domain names (*e.g.* www.example.com) into numeric IP addresses. |
| IANA | Internet Assigned Numbers Authority. |
| ICANN | Internet Corporation for Assigned Names and Numbers. |
| IP | Internet Protocol. When used as part of the phrase "IP address," refers to a numerical label assigned to an electronic device that connects to the Internet (*e.g.* a computer, mobile phone, or printer). |
| IPv4 | Internet Protocol version 4 (distinguished from Internet Protocol version 6). |
| ISO 3166-1 | International Organization for Standardization under its standard number 3166-1, assigning two letter codes (e.g. "US") to every territory. |

## BRIEF OF PLAINTIFFS-APPELLEES-APPELLANTS

## JURISDICTIONAL STATEMENT

The district courts in the underlying proceedings had jurisdiction pursuant to 28 U.S.C. §§ 1330, 1331, 1332, 1605(a)(7) (prior to its repeal), and 1605A.

The court below had federal question jurisdiction over these matters in that they are proceedings to enforce judgments under Fed. R. Civ. P. 69, 28 U.S.C. § 1610, and the Terrorism Risk Insurance Act of 2002 § 201 ("TRIA"), codified as a note to 28 U.S.C. § 1610.

This court has jurisdiction pursuant to 28 U.S.C. § 1291. The Orders appealed from were entered on November 12, 2014. (18, 90, 108, 147, 177, 196, 216). Plaintiffs timely noticed their appeals from those Orders on December 12, 2014. (77-78, 95-96, 114-15, 155-56, 184-85, 206-07, 229-30).

## ISSUES PRESENTED

1.      Whether country-code top level domain names and IP addresses assigned to the judgment debtors are property or might be property subject to attachment under District of Columbia law, including D.C. CODE § 16-544?

2.      Whether the district court abused its discretion in failing to allow discovery so that it could better determine whether country-code top level domain names and IP addresses assigned to the judgment debtors are property or might be

property subject to attachment under District of Columbia law, including D.C. CODE § 16-544?

3.      Whether this Court should certify the fundamental questions in this appeal, which are important questions of first impression turning solely on the proper interpretation of District of Columbia statute, to the District of Columbia Court of Appeals for its resolution?

## STATUTORY AUTHORITY

The pertinent District of Columbia statute is D.C. CODE § 16-544, which provides (in full):

> **Property subject to attachment**. An attachment may be levied upon the judgment debtor's goods, chattels, and credits.

This statute, 28 U.S.C. § 1610(g), TRIA § 201, and the statutes of other jurisdictions that are similar to D.C. CODE § 16-544 and/or pertinent to this appeal are set forth in the Statutory Addendum.

## STATEMENT OF FACTS

The Plaintiffs are victims of terrorism and the family members of victims of terrorism; they have obtained judgments amounting to hundreds of millions of dollars against the governments of the Islamic Republic of Iran ("Iran"), the Democratic People's Republic of Korea ("North Korea"), and the Syrian Arab Republic ("Syria") for the roles played by those governments in terrorist attacks in

which Plaintiffs and their relatives were injured. Although the Plaintiffs have diligently searched for assets in the United States against which to enforce their judgments, and have made some recoveries, their judgments remain largely unsatisfied.

This appeal is from seven judgment enforcement proceedings before the U.S. District Court for the District of Columbia, consolidated on appeal. Each of the judgment enforcement proceedings was an independent case involving different facts and different defendants. They were united before the district court for the purpose of partially satisfying the judgments against the various defendants with assets held and/or controlled by ICANN. The Plaintiffs initiated these proceedings by serving ICANN with writs of attachment, together with a letter and subpoenas, in which they made clear that they had attached the country-code top level domain names (for example, Iran's .IR, as in www.example.ir) and the internet protocol ("IP") addresses of Iran, Syria, and North Korea. The district court, finding the matter to be one of first impression in the District of Columbia, erroneously applied the law of another jurisdiction and dismissed these enforcement actions.

### A.  The Attached Assets

#### 1.     IP Addresses

Before delving into the facts directly pertinent to these enforcement proceedings, Plaintiffs describe and explain the Internet assets that they attached and

with which they seek to enforce their judgment. To do so, they start by describing the Internet more broadly.

Computers find one another over the Internet by using IP addresses, which are strings of numbers separated by periods, such as "192.0.34.163." (24.1\*). Just like a street address or telephone number identifies a particular location, an IP address identifies a particular machine. To operate effectively and consistently, an IP address must be unique and must follow uniform protocols throughout the entire Internet network (*i.e.* the entire globe). *See id*.

IP addresses in use on the worldwide Internet largely conform to a protocol known as Internet Protocol version 4 ("IPv4"). Following that protocol, IP addresses are a series of four numbers, each separated by dots, ranging from 0 to 255. By the nature of IPv4, the number of available addresses is not merely finite, but greatly limited. Theoretically, IPv4 provides slightly more than 4 billion addresses. But large blocks of those addresses are unavailable for public allocation, significantly reducing the number of addresses available. *See* Wikipedia, IPv4 Address Exhaustion, https://en.wikipedia.org/wiki/IPv4_address_exhaustion. The number of available IPv4 addresses is dwindling and, many believe, will soon be exhausted.

---

\* Unless otherwise noted, parenthetical numerical references refer to pages of the Appendix. Page citations to the *Weinstein* docket are to the page numbers in the ECF stamp atop the page, rather than the page numbers appearing at the bottom of the page.

*See* Iljitsch van Beijnum, *With the Americas running out of IPv4, it's official: The Internet is full*, ARS Technica, June 12, 2014, http://arstechnica.com/information-technology/2014/06/with-the-americas-running-out-of-ipv4-its-official-the-internet-is-full/.

Historically, IP addresses have been distributed in blocks by ICANN and its predecessors to five regional distributors, which further distribute the addresses. ICANN's original assignments and the assignments of the regional distributors are not made subject to time limitations or conditions. As a result of inefficient allocation and no attempts to recoup unused or poorly allocated addresses, a secondary market has developed for the trade of IPv4 addresses. There are, indeed, multiple active brokers of IP addresses on this secondary market.[1]

Once allocated, an IP address enables any third party to access the machine associated with that number. For example, to access Google's search page, one can enter 173.194.65.113, a Google IP address, into the search bar of their web browser.

Of course, 173.194.65.113 is not as easy to remember as is www.google.com. Because people generally remember names better than they do numbers, the Internet utilizes a system by which names (*e.g.* www.google.com) are translated into

---

[1] Examples of such brokers include IP Trading, http://www.iptrading.com, IPv4 Market Group, http://ipv4marketgroup.com, and Accuro Consulting, http://www.ipaddressbroker.net.

numbers (*e.g.* 173.194.65.113) to facilitate simpler Internet navigation. That system, known as the Domain Name System ("DNS"), operates as follows: When a user types a domain name into his web browser, the browser turns initially to what can be grossly described as a phone book of "top level domain names." (The top level domain names are those appearing farthest to the right in the domain name. Examples include generic top level domains such as ".COM",".ORG," or more recent additions such as ".SUCKS," as well as country-code top level domains such as ".US", ".CO", and ".TV".[2]) The browser accesses the "Root" directory (or some copy thereof), which is controlled by ICANN, to point to a specific top level domain directory or registry,[3] which in turn will identify the location of the registry or computer with the information necessary to resolve the next domain name element— the second level domain. This process repeats until each element in the domain name has been resolved (or translated) such that the browser obtains the IP address for the

---

[2] In our earlier example (www.google.com), the top level domain name is .COM. The top level domain name for this court (www.cadc.uscourts.gov) is .GOV. And the top level domain for the Iranian Ministry of Foreign Affairs (www.mfa.gov.ir) is .IR.

[3] A top level domain's "registry" is similar to a telephone operator for that top level domain. Registries are responsible for facilitating their top level domain and for recording the identities and locations of each of the secondary domain names registered within that top level domain. Registries often pay considerable annual fees to ICANN in order to maintain their monopolies over the domain name that they oversee.

server hosting the website it seeks to connect to (that is, until it has fully translated www.google.com into 173.194.65.113).

To illustrate further: When a user types www.cadc.uscourts.gov into his browser, the browser will not necessarily already know the IP address for a server hosting this Court's website. In that instance, it will query the Root directory for the location of the United States Government's .GOV registry. It will then contact that registry, seeking the location of a server hosting the registry of the second level domain, .USCOURTS. Upon contacting that server, it will seek the location of the server hosting the third level domain, .CADC., and will finally query that server for the location of the fourth level domain, WWW, this Court's world wide web format page. Upon completing the last step, the browser will learn this Court's IP address, and will thus be able to connect to its webpage.[4]

### 2.    Country-Code Top Level Domains

As the key to the creation, and resolution, of all domain names, top level domains play a significant role and have considerable value. As noted, top level domain names come in two essential forms: generic and country-code. Generic top level domain names (*e.g.* .COM and .ORG) are intended to be available without

---

[4] A lucid graphic illustrating the DNS is available at STEVE CROCKER ET AL., SECURITY AND OTHER TECHNICAL CONCERNS RAISED BY THE DNS FILTERING REQUIREMENTS IN THE PROTECT IP BILL 15 (2011), http://domainincite.com/docs/PROTECT-IP-Technical-Whitepaper-Final.pdf.

reference to geography. In contrast, country-code top level domain names refer to and are meant to facilitate the Internet operations of particular countries or territories. Those domain names are simply a dot followed by the two-letter code designated by the International Organization for Standardization under its standard known as "ISO 3166-1."[5] The standard assigns the code "US" to the United States, thus the United States' country-code top level domain is .US. Similarly, ISO 3166-1 designates "TV" to the country of Tuvalu; its country-code top level domain is .TV.

Country-code top level domain names are valuable. As a result, governments claim them as state assets. For example, in 2008, the United States government asserted ownership of the .UM country-code top level domain, which is assigned to 8 Pacific islands and 1 Caribbean island that belong to the United States and are collectively referenced as the United States Minor Outlying Islands.[6] In a 2008 letter, the National Telecommunications & Information Administration, a federal agency within the U.S. Department of Commerce that is responsible for Internet governance, wrote that because United States Minor Outlying Islands are "under the jurisdiction

---

[5] ISO 3166-1 assigns two-letter codes to each country or territory.

[6] ISO, Online Browsing Platform, UM, https://www.iso.org/obp/ui/#iso:code:3166:UM (last visited Aug. 24, 2015); *see also* Wikipedia, United States Minor Outlying Islands, https://en.wikipedia.org/wiki/United_States_Minor_Outlying_Islands.

of the United States Government," "the .UM ccTLD[7] is a United States Government asset." (*Weinstein*, No. 00-cv-2601, docket entry 107-2 at 73). Several other sovereign governments have relied on their control over territory as demonstrative of ownership and control of the corresponding country-code top level domain. At least three of them (Columbia, Libya, and Tuvalu) have leveraged their interests in their country-code top level domains (respectively, .CO, .LY, and .TV) by reaching arrangements to commercially market space on their respective domains, thus competing with for profit concerns that manage popular generic top level domains, such as .COM.

### B.  ICANN's Role as Garnishee of the Attached Assets

Prior to ICANN's establishment in 1998, the Internet Assigned Numbers Authority ("IANA"), administered by Dr. Jon Postel, a computer scientist at the Information Sciences Institute of the University of Southern California, acting pursuant to a contract with the U.S. Department of Commerce, oversaw the Internet's governance and operations. Among its roles was the distribution and assignment of IP addresses and top level domains. *See* (24.2-24.3); *see also* ICANN, Contract bet. U.S. Dept. of Commerce and ICANN, July 29, 2012, http://www.ntia.doc.gov/files/ntia/publications/sf_26_pg_1-2-final_award_and_sacs.pdf

---

[7] "ccTLD" is the common abbreviation for country-code top level domain.

(reproduced at *Weinstein*, No. 00-cv-2601, DE 89-3 Ex. B). Postel, acting on behalf of IANA, created and assigned the original country-code domains, relying on the standards set by ISO 3166-1.

When ICANN was created in 1998, it took over IANA and all of its responsibilities (IANA continues to operate as a division of ICANN). Today, ICANN is ultimately responsible for the distribution of IP addresses. And while, as far as Plaintiffs are aware, it has never exercised the authority to reclaim blocks of IP addresses, it certainly has that authority. Further, ICANN is responsible for the delegation and assignment of all top level domain registries. (Control over a top level domain does not transfer without ICANN's say so.) And ICANN maintains the technical and administrative details of the DNS's "Root Zone Database," used to compile the Root Zone of the Internet, which is the authoritative place to look up the network location of the more than 650 top level domains in operation today. (24.3). ICANN's control of the Root Zone Database makes it responsible for the operation of the DNS and the referral information that allows computers searching for a domain to connect to the various top level domains.

ICANN maintains contractual relations, informal agreements, and other contacts with the registry operators or sponsors of many or all of the top level domains. Those contracts and agreements generally set forth the parties' obligations and duties. *See* (24.3). Such contracts and agreements exist in written form for many

-10-

or all of the generic top level domains and many of the country-code top level domains. Many of the country-code top level domains do not have formal written agreements with ICANN. But it is highly likely that, over the years, those country-code top level domains have entered into informal agreements or oral contracts with ICANN, given ICANN's nearly exclusive control of the DNS and the domain name delegation process.

       1.     The IP Addresses of Iran, North Korea, and Syria

The governments of Iran, North Korea, and Syria, possess and maintain many IP addresses. Iran and Syria receive those addresses under license and contractual agreement with RIPE NCC, the regional Internet registry that serves Europe and the Middle East, and North Korea receives them under license and contractual agreement with APNIC, the regional Internet registry that serves the Asia/Pacific region. RIPE NCC and APNIC receive their addresses under license and contractual agreements with ICANN. ICANN retains the ownership interest in all of those IP addresses and continues to maintain considerable power over the administration of the Internet and the various protocols that render an IP address functional and valuable. It has the ability to demand from RIPE NCC and APNIC and/or disable the blocks of addresses allocated to the governments of Iran, North Korea, and Syria.

### 2.     Iran's Country-Code Top Level Domains

Two country-code top level domains have been delegated by ICANN to the Iranian government: the .IR domain and the ايران. domain (ايران being Farsi for "Iran"). *See* (24.9); IANA, Report on the Delegation of the ايران ("Iran") domain representing the Islamic Republic of Iran in Arabic, Sept. 13, 2013, http://www.iana.org/reports/2013/iran-report-20130913.html (reproduced at *Weinstein*, No. 00-cv-2601, DE 89-3 Ex. G). The current manager for both of Iran's country-code top level domains is the Institute for Research in Fundamental Sciences, an Iranian agency or instrumentality wholly owned and/or controlled by the Iranian government and located in Tehran. *See* (24.9); IANA, Delegation Record for .IR, Mar. 24, 2015, http://www.iana.org/domains/root/db/ir.html (reproduced at *Weinstein*, No. 00-cv-2601, DE 89-3 Ex. H).

ICANN controls the operation of these top level domains and maintains substantial rights over them through its operation of the DNS, control of the Root Zone Database, and authority to redelegate Iran's top level domains. ICANN claims that it has never entered into any type of agreement with Iran relating to its country-code top level domains, and has never obtained funds or contributions relating to these country-code top level domains. (24.4-24.5). But that is impossible. Either ICANN or one of its predecessors in interest necessarily conveyed those top level domains to Iran for an indefinite period and for Iran's indefinite use and enjoyment

while retaining control over the Root Zone Database and maintaining authority to redelegate the domains. Absent such a conveyance by ICANN to Iran, there is no rational explanation (ICANN offers none) for the present state of affairs.

### 3.    North Korea's Country-Code Top Level Domain

The .KP country-code top level domain has been delegated by ICANN to North Korea. The current country-code top level domain manager for the .KP country-code top level domain is North Korea's Star Joint Venture Company, which is located in Pyongyang. *See* (24.9); IANA, Delegation Record for .KP, July 18, 2011, http://www.iana.org/domains/root/db/kp.html (reproduced at *Weinstein*, No. 00-cv-2601, DE 89-3 Ex. K). Star "is a joint venture between the Korean Post and Telecommunications Corporation, a [North Korean] governmental enterprise[,] and Loxley Pacific Company Limited." IANA, Redelegation of the .KP domain representing the Democratic People's Republic of Korea to Star Joint Venture Company, Apr. 1, 2011, http://www.iana.org/reports/2011/kp-report-20110401.html.

ICANN controls the operation of this top level domain and maintains substantial rights over it through its operation of the DNS, control of the Root Zone Database, and authority to redelegate the .KP top level domain. ICANN claims that it has never entered into any type of agreement with North Korea relating to its country-code top level domains, and has never obtained funds or contributions

relating to these country-code top level domains. (24.4-24.5). But that is impossible. Either ICANN or one of its predecessors in interest necessarily conveyed the .KP top level domain to North Korea for an indefinite period and for North Korea's indefinite use and enjoyment while retaining control over the Root Zone Database and maintaining authority to redelegate the domain. Absent such a conveyance by ICANN to North Korea, there is no rational explanation (ICANN offers none) for the present state of affairs.

### 4.    Syria's Country-Code Top Level Domains

Two country-code top level domains have been delegated by ICANN to the Syrian government: the .SY domain and the .سورية domain (سورية being Arabic for "Syria"). *See* (24.9); (*Weinstein*, No. 00-cv-2601, DE 89-3 Ex. I). The current manager for both of Syria's top level domains is Syria's National Agency for Network Services, a Syrian governmental agency located in Damascus. *See* (24.9); ICANN, IDN ccTLD Fast Track String Evaluation Completion, https://www.icann. org/resources/pages/string-evaluation-completion-2014-02-19-en; (*Weinstein*, No. 00-cv-2601, DE 89-3 Ex. J).

ICANN controls the operation of these top level domains and maintains substantial rights over them through its operation of the DNS, control of the Root Zone Database, and authority to redelegate Syria's top level domains. ICANN claims that it has never entered into any type of agreement with Syria relating to its

country-code top level domains, and has never obtained funds or contributions relating to these country-code top level domains. (24.4-24.5). But that is impossible. Either ICANN or one of its predecessors in interest necessarily conveyed those top level domains to Syria for an indefinite period and for Syria's indefinite use and enjoyment while retaining control over the Root Zone Database and maintaining authority to redelegate the domains. Absent such a conveyance by ICANN to Syria, there is no rational explanation (ICANN offers none) for the present state of affairs.

### C.  Procedural History

On or about June 24, 2014, Plaintiffs served ICANN, as a third-party garnishee holding assets of Iran, North Korea, and Syria, with writs of attachment issued by the Clerk of the court below, subpoenas *duces tecum* seeking documents related to the attached assets, and a letter explaining both. (For example, in *Weinstein*, No. 00-cv-2601, see DE 83).

On July 29, 2014, in partial response to the aforementioned writs of attachment, ICANN filed a motion to quash in each of the seven actions. (22). That motion to quash, accompanied by 240 pages of exhibits and a 22 page memorandum of law, rested on substantive questions that get to the heart of these attachment proceedings. ICANN addressed in that motion questions such as whether the property sought by the writs of attachment is in fact subject to attachment, where the property is located, whether ICANN has the authority to transfer it, and what role

-15-

the Foreign Sovereign Immunities Act plays in determining whether the plaintiffs may collect that property. (*Weinstein*, No. 00-cv-2601, DE 89-1 at *i*). In so doing, ICANN made numerous factual assertions that Plaintiffs had no ability to counter. They conducted an initial investigation that uncovered documents that impeached many of ICANN's representations by demonstrating that ICANN's representations were incomplete or simply false. For example, ICANN asserted that country-code top level domains are not property and instead are akin to service contracts. (*Weinstein*, No. 00-cv-2601, docket entry 89-1 at 18). But, as noted, the U.S. Department of Commerce, which regulates ICANN, deems the .UM country-code top level domain "a United States Government asset." (*Weinstein*, No. 00-cv-2601, docket entry 107-2 at 73). Similarly, despite ICANN's protestation that it is unable to effect transfers of country-code top level domains (*Weinstein*, No. 00-cv-2601, docket entry 89-1 at 25-27), written statements made by ICANN and the NTIA both indicate that ICANN's Board of Directors *alone* had made the decision to change the assignment of the ".UM" country-code top level domain.  (*Weinstein*, No. 00-cv-2601, docket entry 107-2 at 73-74, 81-83).

In light of the factual revelations uncovered by the Plaintiffs' limited investigation, conducted without the benefit of civil discovery, Plaintiffs sought leave from the district court to engage in substantial discovery. (31-33). Plaintiffs explained that the issues raised by ICANN's motion to quash concern novel

questions of law about which there exists little or no precedent and turn on technical facts about which the average citizen knows very little. They further explained that, notwithstanding ICANN's extensive submission of exhibits to the district court, the presented documents "do not present a complete picture with regard to the relevant facts" and that the "Plaintiffs' research to date demonstrates that [ICANN's presentation] is far from" the reality. (*Weinstein*, No. 00-cv-2601, docket entry 107 at 13-14). Plaintiffs thus argued that in order to properly respond to ICANN's motion to quash, they needed to take discovery on a number of discrete issues.

Specifically, Plaintiffs sought to take discovery to dispute the two essential arguments raised by ICANN in its motion to quash: 1) ICANN's assertion that the attached Internet assets (country-code top level domains and IP addresses) are not "property" (*i.e.* valuable assets owned by the judgment debtors) and 2) that even if the assets are property, ICANN is unable to transfer the assets (either due to restrictions on ICANN or other extrinsic restrictions). (*Weinstein*, No. 00-cv-2601, docket entry 107 at 17). To that end, Plaintiffs identified particular factual issues on which they sought further discovery, including:

- ICANN's role in the establishment and/or operation of top level domains, both generic (such as .com and .net) and country specific (such as .US, .UK and .IR);

-17-

- ICANN's role and limitations in carrying out the tasks previously performed by IANA and its role in maintaining and operating the Root Zone Database;

- The allocation and management of country-code top level domains and ICANN's policies with regard to country-code top level domains;

- The relationship between ICANN and the United States government;

- Whether country-code top level domains managers have exclusive rights to manage and operate their country-code top level domains;

- Whether ICANN has the power to forcibly transfer a country-code top level domain without consent of all parties involved and whether this has ever been done in the past;

- The effects, if any, that transfer of a country-code top level domains from one manager to another may have on the rights of second level domain owners within that country-code top level domain; and

- Information regarding ICANN's ownership and interest in distributed IP address (a topic about which ICANN disclosed *nothing* in seeking to quash Plaintiffs' writs of attachment).

(*Weinstein*, No. 00-cv-2601, docket entry 107 at 15-16).

Two days after Plaintiffs requested discovery, they formally responded to ICANN's motion to quash. The response, styled as a "*Preliminary* Response," was not even two full pages in length. (58-61). It briefly described the pending motion for discovery and indicated that such discovery was necessary for them to properly respond to ICANN's motion. (60-61). It offered no substantive analysis and was clearly intended as a *preliminary* response, pending discovery.

Then, slightly more than a month later, the court below (Lamberth, *J.*) quashed the writs of attachment and denied Plaintiffs' motion for discovery as moot. (63-73). Rather than address the numerous factual issues raised by ICANN and Plaintiffs' arguments explaining why it is necessary to engage in discovery before resolving ICANN's factual issues, the district court instead focused solely on the question of whether the country-code top level domains "may be attached in satisfaction of a judgment" under District of Columbia law. (71-73). (Perhaps taking a cue from ICANN, it made no mention of the IP address that Plaintiffs had also attached.[8])

The district court held that the question before it was of first impression, noting: "There is little authority on the question of whether Internet domain names may be attached in satisfaction of a judgment. Indeed, no reported decision of any

---

[8] Undoubtedly, this error by the district court would have been prevented if it had permitted the Plaintiffs to engage in discovery and fully oppose ICANN's motion to quash on the merits.

American court appears to have decided the specific issue of whether a [county code top level domain] may be attached." (71).

Finding nothing within the District of Columbia to guide its decision, the District Court simply applied the law of Virginia, finding a decision by Virginia's high court to be "helpful," even if not directly on point. (71). And, in applying Virginia law, but without explaining how Virginia law informed District of Columbia law, the court below held that the Internet assets, even if "intangible property," "may not be attached in satisfaction of a judgment under *District of Columbia* law." (73) (emphasis added) (citing *Kremen v. Cohen*, 337 F.3d 1024, 1030 (9th Cir. 2002)).

Specifically, borrowing from the reasoning of the Virginia high court, the district court found that it "may not, through garnishment proceedings, insert a judgment creditor into an ongoing contractual arrangement that necessarily requires continued work or services to have value." (72-73). It got there by first making an affirmative finding, without the benefit of discovery or adversarial briefing, that country-code top level domains "only have value because they are operated by [country-code top level domain] managers and because they are connected to computers thought the root zone." (73).

Thus, the essential legal issue in this appeal is whether, under District of Columbia law, one may (or possibly may, depending on the resolution of factual

questions after discovery) attach the country-code top level domains and IP addresses of a judgment debtor. That, as the district court acknowledged, is a question of first impression. Secondary to that question is another: Whether the district court abused its discretion in refusing to allow initial discovery. But that secondary question ultimately turns on the meaning of District of Columbia attachment law (again, a matter of first impression).

## SUMMARY OF ARGUMENT

The Court below erred in determining that the Internet assets of the judgment debtors, even if property, are not subject to attachment under District of Columbia law. The governing statute, D.C. CODE § 16-544, has long been interpreted to permit the garnishment of intangible and incorporeal assets, which plainly include the attached Internet assets. Rather than interpret § 16-544, the district court applied Virginia law, treating it as though it were the law of the District of Columbia. It should not have even looked to Virginia law for guidance, given that 1) the pertinent statutes of California and Minnesota, which have been held to reach Internet assets like domain names, are far more similar to § 16-544 then are the pertinent Virginia statutes and 2) the Virginia decision relied upon by the district court is flawed and dependent on facts not existent here.

In reliance on its erroneous legal conclusion about District of Columbia law, the district court abused its discretion in denying the Plaintiffs the ability to take

discovery, develop a more complete record to facilitate the proper resolution of this case, and demonstrate the falsity or deficiency of many of ICANN's representations. For instance, facts sought in discovery would have established that the attached Internet assets are property of the judgment debtors. The district court's failure to allow the development of a sufficient record might prevent this Court from now determining whether the assets are indeed property. But it need not do so now—all that it must decide is that the assets *might* be subject to attachment under District of Columbia law.

Ultimately, that question of first impression, about which the District of Columbia Court of Appeals has provided little guidance and which is of great importance—in light of its implications to the Internet community and in regard to the very strong interest in preventing and combatting terrorism—should be decided by the District of Columbia Court of Appeals on certified questions.

## STANDARD OF REVIEW

The district court's resolution of a question of District of Columbia law— whether D.C. CODE § 16-544 permits or might permit attachment of the judgment debtor's internet assets—is reviewed *de novo*. *Williams v. Johnson*, 776 F.3d 865, 869 (D.C. Cir. 2015); *Teltschik v. Williams & Jensen, PLLC*, 748 F.3d 1285, 1287 (D.C. Cir. 2014) ("We review de novo the District Court's determinations of D.C. law.").

-22-

Discovery orders are generally reviewed for abuse of discretion, however, when premised on an error of law, they are deemed "arbitrary." *Tuite v. Henry*, 98 F.3d 1411, 1415 (D.C. Cir. 1996).

## ARGUMENT

### I. The District Court Erred in Determining that the Attached Internet Assets are Not Subject to Attachment under District of Columbia Law

#### A. Applicable District of Columbia Law Demonstrates that the Internet Assets are or Might be Attachable

The narrow question of whether a judgment can be enforced against a top level domain name or against IP addresses as intangible property is one of first impression in the District of Columbia. Notwithstanding the lack of District of Columbia case law on point, the District of Columbia's attachment statute and controlling precedent establish that the District of Columbia would likely view such assets as intangible property subject to its attachment statute.

The District of Columbia Code grants judgment creditors seeking to attach property a great deal of latitude, explicitly allowing the attachment to "be levied upon the judgment debtor's goods, chattels, and credits." D.C. CODE § 16-544. Given the statute's plain language, any kind of personal property of the judgment debtor is within the ambit of attachment, including intangibles such as debts. *See,*

-23-

*e.g.*, BLACK'S LAW DICTIONARY 715 (8th ed. 2004) (defining "goods and chattels": "Loosely, personal property of any kind[.]").

Indeed, this Court has long recognized that the statutory grant of authority over "goods, chattels, and credits" has "a broad and inclusive meaning," such that attachment may reach a judgment debtor's transferrable "intangible or incorporeal interest." *Rowe v. Colpoys*, 137 F.2d 249, 249-51 (D.C. Cir. 1943) (describing a liquor license as an "intangible or incorporeal interest" that could be attached under the D.C. Code and as a valuable right with attributes of property). *Rowe* explained, "[o]bviously, there is no longer any substantial reason for preserving disparate categories of property, or of rights or interests in property, out of which to satisfy judgments which chance to be recovered in law or in equity proceedings. The modern trend of legislation is in this direction, and judicial interpretation, unhampered by contrary precedent in the District of Columbia, should go in the same direction." *Id.* at 250-51; *see also Goldberg v. Southern Builders*, 184 F.2d 345, 348 (D.C. Cir. 1950) (discussing attachment of intangible property in the form of debts).

Since the District of Columbia has long taken a broad view of the rights of attachment of judgment creditors, permitting the attachment of intangible or incorporeal interests, it is only logical to conclude that it would permit the attachment of domain names for judgment enforcement purposes. Indeed, at least one court in this Circuit has held that internet domain names are transferable

-24-

intangible property under District of Columbia law. *Xereas v. Heiss*, 933 F. Supp. 2d 1, 6 (D.D.C. 2013) (determining that internet domain names are intangible rather than tangible property) (citing *Kremen v. Cohen*, 337 F.3d 1024, 1030 (9th Cir. 2003); *Famology.com, Inc. v. Perot Sys. Corp.*, 158 F. Supp. 2d 589, 591 (E.D. Pa. 2001)).

But even assuming that District of Columbia law is ambiguous, the district court erred in applying Virginia law simply because it found a Virginia Supreme Court decision "helpful." (71). Rather, it was obligated to first parse the statutory language, attempting to determine what the statute probably means. "The primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he has used." *Jackson v. United States*, 819 A.2d 963, 965 (D.C. 2003). But the district court did not attempt to parse the statutory language.

As noted above, the language of D.C. Code § 16-544 is exceptionally broad, clear, and simple. And it has been interpreted by this Court to reach even "intangible or incorporeal interest[s]." *Rowe*, 137 F.2d at 249-51. Following discovery, Plaintiffs will demonstrate that the judgment debtors have an interest in the attached Internet assets (their country-code top level domains and IP addresses) that is at least "intangible" or "incorporeal." Prior to discovery, the district court had no ability to hold to the contrary and, in fact, did not.

-25-

Even if it found the statutory language to be ambiguous, the district court had no authority to simply adopt Virginia law. When deciding questions of first impression in the District of Columbia, courts look first to the law of Maryland— not Virginia—for guidance. *Conesco Indus., Ltd. v. Conforti & Eisele, Inc., D. C.*, 627 F.2d 312, 315-16 (D.C. Cir. 1980); *Nationwide Mut. Fire Ins. Co. v. Wilbon*, 960 F. Supp.2d 263, 269 (D.D.C. 2013) ("D.C. courts look to Maryland law in the absence of D.C. precedent."); D.C. CODE § 45-401 (adopting Maryland's common law as existing in 1801). The district court made no inquiry into Maryland law.

And even if the district court had found Maryland law unhelpful, it could not simply adopt the law of another jurisdiction, even a neighboring one. Rather, it was obligated to "look...to other jurisdictions with *similar statutes* to determine whether their interpretations provide any guidance on how to interpret the phrase" at issue. *Jackson*, 819 A.2d at 965 (emphasis added) (analyzing a California decision relying on similar statutory language to help resolve textual ambiguity). That the high court of another jurisdiction resolved a question closely on point, but relying in a *dissimilar* statute is quite irrelevant. 19 Fed. Prac. & Proc. Juris. § 4507 ("[T]he federal court must determine issues of state law as it believes the highest court of the state would determine them, not necessarily...as they have been decided by other state courts in the past."); *see Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.*,

944 F.2d 940, 944 (D.C. Cir. 1991) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)).[9]

Plaintiffs' research has revealed just three states that have directly addressed the question of whether domain names are subject to attachment as intangible property: California, Minnesota, and Virginia (the pertinent statutes of each are reproduced in the Statutory Addendum). Consistent with *Jackson*, the district court should have analyzed the statutes of those three states and decided which is most similar to D.C. CODE § 16-544. It did not.

### B. The Statutes of California and Minnesota, Both of Which Allow Attachment of Domain Names, are More Similar to D.C. CODE § 16-544 than are Virginia's Statutes

*California*. California's law on judgment enforcement states: "Except as otherwise provided by law, *all property* is subject to enforcement of a money judgment" and that "all property that is subject to enforcement of a money judgment...is subject to levy under a writ of execution to satisfy a money judgment." CAL. CIVIL PROCEDURE CODE §§ 695.010(a), 699.710 (emphasis added). That language has long been interpreted to include Internet domain names, particularly

---

[9] At the risk of stating the obvious, Plaintiffs note that federal courts applying District of Columbia law must interpret that law as the District of Columbia Court of Appeals likely would. *United States v. Edmond*, 924 F.2d 261, 264 (D.C. Cir. 1991); *Thomas v. City Lights Sch., Inc.*, 124 F. Supp. 2d 707, 709 (D.D.C. 2000).

permitting the attachment of domain names. *See Kremen v. Cohen,* 337 F.3d 1024, 1030 (9th Cir.2003); *Office Depot, Inc. v. Zuccarini*, 596 F.3d 696, 701-702 (9th Cir. 2010). In *Office Depot*, the Ninth Circuit expressly held that California law permits the use of a writ of execution against Internet domain names in the control of a third-party garnishee to satisfy outstanding judgments, stating:

> There are thus two questions before us. First, are domain names property that is subject to execution? Second, if so, where are the domain names located for purposes of execution? We address these questions in turn. First, we have already held that domain names are intangible property under California law. *Kremen v. Cohen,* 337 F.3d 1024, 1030 (9th Cir.2003).... We conclude that *Kremen* is still an accurate statement of California law, and that *domain names are intangible property subject to a writ of execution*.

*Id*. at 701-2 (emphasis added).

D.C. CODE § 16-544, when read together with *Rowe*, is closely analogous to CAL. CIVIL PROCEDURE CODE §§ 695.010(a), 699.710. The former provides that "[a]n attachment may be levied upon the judgment debtor's goods, chattels, and credits." *Rowe* says that the language "goods and chattels" has "a broad and inclusive meaning," and includes essentially all forms of property, including licenses and other intangible property. *Rowe*, 137 F.2d at 250-51. So understood, District of Columbia law permits 'an attachment to be levied against all property of the judgment debtor,' much like CAL. CIVIL PROCEDURE CODE §§ 695.010(a), 699.710.

-28-

*Minnesota*. Minnesota statute similarly permits attachment by garnishment of "all" nonexempt property, whether intangible or tangible, of "any kind." MINN. STAT. § 571.73, subd. 3(3). It is thus materially similar to California's statutes and D.C. CODE § 16-544. And, like California, Minnesota's courts recognize that "a domain name is a form of property," based on characteristics such as being "unique and exclusionary," subject to voluntary transfer, and an "asset with measurable value," notwithstanding that its owner faces a potential "involuntary" termination of its rights. *Sprinkler Warehouse, Inc. v. Systematic Rain, Inc.*, 859 N.W.2d 527, 530-31 (Minn. Ct. App. 2015) (review granted (Apr. 28, 2015)). Accordingly, "a domain name is a form of property…subject to garnishment under Minn. Stat. § 571.73." *Id.* at 532.

*Virginia*. VIRGINIA CODE §§ 8.01-474, 8.01-478 standing alone, superficially appear to be similar to D.C. CODE § 16-544. The Virginia statutes provide that a judgment creditor may collect a money judgment from the "goods and chattels" of the judgment debtor, as well as "money and bank notes." But they differ from D.C. CODE § 16-544 in two important ways. First, the Virginia statutes pertain only to attachment proceedings directly against the judgment debtor while § 16-544 applies, as here, when the property is sought from a third-party garnishee. Second, the Virginia statutes do not reach the "credits" of the judgment debtor while § 16-544 does.

VIRGINIA CODE § 8.01-511, which governs garnishment proceedings against third-parties, differs considerably from § 16-544. Section 8.01-511 permits garnishment against third-parties only where the judgment creditor demonstrates that the garnishee holds a "liability" by virtue of its holding the judgment debtor's property. On the face of the statute, therefore, a judgment creditor may not attach *all* property of a judgment debtor in the hands of a third party; it may only garnish that property that constitutes a "liability" (a term undefined by statute).

Virginia's Supreme Court explained the "liability" limitation of § 8.01-511 in the case relied upon by the court below, *Network Solutions, Inc. v. Umbro*: "'Liability' in this context means a legal obligat[ion] enforceable by a civil remedy, a financial or pecuniary obligation, or a debt." 529 S.E.2d 80, 85 (Va. 2000) (internal quotation marks omitted) (alternation in original). In light of that "liability" requirement, the *Umbro* Court was able to resolve the question of whether, under Virginia law, domain names are garnishable property by concluding that "[a] contract for services is not 'a liability' as that term is used in § 8.01-511 and hence is not subject to garnishment." *Umbro*, 529 S.E.2d at 86. It thus held, in express reliance on the unusual language of § 8.01-511, that a domain name is merely a contract for services and is not garnishable. *Id.*

The Supreme Court of Virginia was careful to point out the limitations of its holding. Before parsing § 8.01-511, it noted that garnishment is a creature of statute

-30-

unknown to the common law and, as a result, "the provisions of the statute must be strictly satisfied." *Id.* at 85. The court added that it is powerless to "extend established legal principles beyond their statutory parameters" even in the face an evolution in the marketplace. *Id.* at 88. This strict construction requirement, coupled with the peculiar language of § 8.01-511 (which, of course, was being strictly construed), make *Umbro* a poor choice for guidance as to the law of any other jurisdiction.[10]

Neither D.C. CODE § 16-544 nor any other pertinent District of Columbia statute imposes as a prerequisite to garnishment any sort of "liability" requirement. As such, applying the reasoning of *Umbro* to § 16-544 would be inappropriate even if the courts of California and Minnesota had not ruled to the contrary. But given that the courts of California and Minnesota *have* held that domain names are garnishable intangible property, and given that the statutes of those states are more similar to D.C. CODE § 16-544 than is § 8.01-511, the law of California and Minnesota, rather than that of Virginia, inform the meaning of D.C. CODE § 16-544.

---

[10] Indeed, the propriety and necessity of *Umbro* is not obvious even with regard to Virginia's garnishment law. Two justices of Virginia's Supreme Court dissented, finding that because the garnishee had received from the judgment debtor everything it needed to provide its services, the contractual right conferred to the judgment debtor, which was undoubtedly a "valuable asset," is "intangible personal property" that is indeed a "'liability' within the meaning of Code § 8.01-511." *Umbro*, 529 S.E.2d at 89 (Compton, *S.J.*, dissenting).

### C.  Virginia's *Umbro* Decision is Inapposite

Notwithstanding the contrary statements by the district court (71), *Umbro* did not hold that "a domain name" is a contract for services. That would seem to be an impossibility; it is almost mirthful to refer to an Internet "domain" as a "contract for services." Perhaps one might argue that the domain is tied up with services contracts. But to argue that the domain *is* a contract is a remarkable position, especially considering ICANN's prior statements that it has no contractual agreements with the judgment debtors.

Rather, *Umbro* held that "domain name *registration* is the product of a contract for services between the registrar and registrant." 529 S.E.2d at 86 (emphasis added). *Umbro* was addressing a slightly different factual scenario (it pertained to an attempt to attach a second level domain names, rather than top level domain names, which are significantly different, as explained in the subsequent paragraphs). The corollary in this case would pertain to the contractual arrangements regarding *future* rights between ICANN and the operators of top level domain names with which ICANN has written contracts. *See In re EBC I, Inc*., 356 B.R. 631, 638 (Bankr. D. Del. 2006) (understanding *Umbro* to refer only to "future internet services"). If *Umbro* were to be applied in the present situation, it might mean that the future services coming to a top level domain that flow from its contractual relationship with ICANN would indeed be the product of a contract rather than a

-32-

"liability." But that does not necessarily mean that the domain itself is not an entity of independent value, attachable under District of Columbia law as intangible property.

In truth, the internet assets sought to be attached in *Umbro*—second level domain names—are materially unlike the top level domain names attached in this litigation. *Umbro* held that second level domains arise from a contract for services based on the domain name registration agreement between the registrar of the top level domain (*e.g.*, .COM) and the registrant (*e.g.*, example.com). *See Umbro*, 529 S.E.2d at 86. That holding was essential to its ultimate conclusion that the "contractual right[s]" that define the registration of the second level domain name are "inextricably bound to the domain name services," thus rendering those services inseparable from the contract itself. *Id.* In reaching this conclusion, *Umbro* found it significant that the domain name registration agreement provides the registrant only with a "*conditional* contractual right to exclusive association of the registered domain name with a given IP number *for a given period of time*." *Id.* at 85 (emphasis added). *Umbro's* reasoning is wrong, as Plaintiffs explain *infra*. But, regardless, its description of the interests of holders of second level domains has no bearing on the interests of the judgment debtors in their country-code top level domains:

*First*, the interests of the judgment debtors in their country-code top level domains are not subject to any temporal limitations or other conditions. The

judgment debtors are free to use their top level domains as they see fit and, if they like, may market them for a profit, as was done with the .TV and .CO top level domains. Any profits derived come not from ICANN's provision of services but rather from the exploitation of a resource by the owner of that resource. When ICANN, or a predecessor, transferred the domains to the judgment debtors, it retained for itself the central directory (the Root Zone) and the right and ability to change that directory as well as the right to redelegate the domain's registry. But it otherwise transferred those assets to the judgment debtors indefinitely and without limitation.

*Second*, any power that ICANN has over the attached assets, including the fact that it currently has a measure of possession over those assets, stems only from the fact that the global community allows it to play that role. If the operators of many of the top level domains, tired of ICANN's abusive policies, join together to form a competitor to ICANN and agree to refer all DNS traffic to a new root zone directory created by this competitor, ICANN's monopoly over the Root Zone will be broken and its power over the attached assets minimized or lost entirely. Holders of second level domain names do not have any similar option. The owners of example.com cannot create a competitor .COM top level domain. If they wish, they can cancel their relationship with .COM and purchase a new domain (*e.g.*, example.net or example.us), but that is quite different from the owners of the .IR top level domain,

-34-

together with other top level domains, refusing to recognize ICANN's Root Zone Directory and effectively creating an alternative Internet.

*Third*, the country-code top level domain names that Plaintiffs have attached are not contracts, they are intangible things. Those domains may be operated pursuant to contracts with ICANN, although ICANN denies the existence of any such contracts. If ICANN is correct and no contracts exist, *Umbro* certainly has no bearing on this case. And even if the domains are operated pursuant to contract, that does not diminish the independent and marketable value of each of the domains in their own right. *See Kremen v. Cohen*, 99 F. Supp. 2d 1168, 1173 n.2 (N.D. Cal. 2000) aff'd in part, rev'd in part, 337 F.3d 1024 (9th Cir. 2003) ("[T]he Virginia Court's rationale is not entirely satisfactory. The Court finds merit in the dissent's position that the right to use domain names 'exists separate and apart from NSI's various services that make the domain names operational Internet addresses. These services...are mere conditions subsequent[.]'" (quoting *Umbro*)). If a business owner contracts with a surveillance and security company to watch and safeguard his business, that fact does not convert his property interests in the business or in the building that houses his business into a services contract. The two (the property interest and the services contract) are obviously separable. The same is true here: The judgment debtors' top level domains have significant inherent value as scarce

and excludable property, independent of any service contracts that might be associated with them.

*Fourth*, while a registry for a top level domain may perform considerable valuable services on an ongoing basis for its second level domains, ICANN does not and need not perform regular valuable services on behalf of the top level domains. Indeed, all that ICANN must do to transfer control of the .IR domain from one party to another is update a *single* entry in the Root Zone Directory *one* time. No monitoring or continuing services are necessary.

For all of these reasons, even if *Umbro* had been correctly decided and even if Virginia's statutes were materially similar to D.C. CODE § 16-544, *Umbro* is nonetheless irrelevant to the current litigation and the district court's reliance upon it is erroneous.

### D.  Virginia's *Umbro* Decision is Erroneous or Incomplete in its Reasoning

*Umbro* held that a domain name registration is a contract for services. As the Minnesota Court of Appeals pointed out, *Umbro* never actually considered or decided whether "a domain name is also property" in addition to being a contract for services. *Sprinker Warehouse*, 859 N.W.2d at 532. And it went on to expressly hold that "despite the fact that a domain name may be categorized *both* as property and as a contract for services, a domain name nevertheless qualifies as property subject

to garnishment under MINN. STAT. § 571.73." *Id.* (emphasis added). The reasoning of *Sprinker Warehouse* is obviously correct; *Umbro's* failure to address the possibility that the domain there at issue was property *in addition* to being tied to a registration contract is puzzling.

Thus, even if this Court were to hold that *Umbro* properly states District of Columbia law (it does not), that would be determinative of nothing. This Court and the district court would still need to determine whether the attached Internet assets are intangible property within the meaning of D.C. CODE § 16-544, notwithstanding that they might also be service contracts. *Umbro* provides no guidance on that issue.

### E. The District of Columbia Court of Appeals Would be Very Unlikely to Follow *Umbro*

As noted, D.C. CODE § 16-544 has been interpreted to cover intangible property and thus should be understood, in its own right (without reference to decisions of other jurisdictions interpreting their local law), to reach top level domain names and IP addresses. But even if the D.C. Court of Appeals would feel compelled to look to the laws of other jurisdictions to help inform the meaning of D.C. CODE § 16-544, Virginia's *Umbro* decision is a very unlikely candidate. Virginia's statutes are materially different from D.C. CODE § 16-544. *Umbro* turns entirely on the Virginia Supreme Court's understanding of the statutory word

-37-

"liability," which is not present in D.C. CODE § 16-544 and was construed strictly. Further, as explained *supra*, the reasoning of *Umbro* is a flawed and incomplete.

The district court, in attempting to apply District of Columbia law, relied only on *Umbro* when it should have been looking to the contrary decisions of the courts of California and Minnesota. Doing so was error.

### F. No Decision of the District of Columbia Court of Appeals Supports the District Court's Holding

The court below concluded its analysis thusly:

While interpretations of the D.C. Code are sparse, they tend to support this understanding of [country-code top level domains]. The District of Columbia Court of Appeals has held that "money payable upon a contingency or condition is not subject to garnishment until the contingency has happened or the condition has been fulfilled." *Cummings Gen. Tire Co. v. Volpe Constr. Co.*, 230 A.2d 712, 713 (D.C. 1967). Thus, payments under a contract that are conditioned upon completion of the work contracted for are not subject to garnishment because the "existence and amount" of the debt is "contingent and uncertain." *Id.* While this suit does not squarely fit within the rule articulated by the court in *Cummings General Tire*, that rule does illuminate the fact that courts may not, through garnishment proceedings, insert a judgment creditor into an ongoing contractual arrangement that necessarily requires continued work or services to have value. Here, the [county code top level domains] only have value because they are operated by [county code top level domain] managers and because they are connected to computers around the world through the root zone.

(72-73). Respectfully, this paragraph misstates both the holding of *Cummings* and the pertinent facts. *Cummings* turns on the contingency and uncertainty of monetary debts, rather than on their connection to service contracts. *Cummings* held that money *due to be paid* pursuant to a services contract, but *contingent* upon the completion of work, is not subject to garnishment. *Cummings General Tire Co. v. Volpe Construction Co.*, 230 A.2d 712, 713 (D.C. 1967). The contingency and uncertainty of the debt in *Cummings*, facts not present here,[11] motivated the court's entire analysis. *Cummings* did not address the potentially-relevant question of whether assets that are somehow "relat[ed] to a services contract" are attachable notwithstanding the existence of the services contract. Nor did *Cummings* address how the law of garnishment treats a services contract that is not subject to contingencies and uncertainties. The court below offered no explanation as to how *Cummings* "tend[s] to support" its holding, notwithstanding that *Cummings* truly has nothing to do with this litigation.

Further, even if *Cummings* were theoretically relevant here, relying on it circularly presumes the answer to a fundamental question to be litigated following discovery. *Cummings* addresses the garnishment of debts accrued pursuant to

---

[11] The judgment debtors' rights to the attached Internet assets do not vest at some indeterminate time in the future. Nor are they subject to conditions or any uncertainty. Those rights are presently enjoyed and exploited by the judgment debtors.

contracts. But Plaintiffs argue that the attached Internet assets are not contracts but rather are intangible property that are directly attachable. It is necessary to first determine whether the attached Internet assets are intangible property, contingent debts, service contracts, or within some other classification before turning to *Cummings*.[12] Plaintiffs argued to the district court and continue to argue that answering that latter question before discovery is unreasonable. Describing the assets as a matter of law without understanding how they operate in practice is essentially impossible. Nonetheless, the district court applied *Cummings*, expressly refusing to decide whether the attached Internet assets are property. (73) ("[T]he conclusion that [country-code top level domains] may not be attached in satisfaction of a judgment under District of Columbia law does not mean that they cannot be property. It simply means that they are not attachable property within this statutory scheme."). That was error.

The district court's reliance on *Cummings* also incorrectly assumed certain facts. It wrote that "[county code top level domains] only have value because they are operated by [county code top level domain] managers and because they are connected to computers around the world through the root zone." (73). This factual

---

[12] Plaintiffs do not suggest that service contracts are not garnishable under D.C. CODE § 16-544. They can be and the district court's reliance on *Cummings* for the alternative rule was erroneous.

assertion contains numerous errors: 1) As shown *supra*, country-code top level domains are monetizable and have indeed been monetized. Their value as things (intangible property) is intrinsic. 2) That top level domain names must be operated by someone is irrelevant, both because the assets have value in their own right and because the sponsors and registries of the top level domains of Iran, North Korea, and Syria are agencies or instrumentalities of those countries and are thus not distinct from them for the purposes of judgment enforcement. *See*, *e.g.*, 28 U.S.C. 1610(g) (reaching property of agencies and instrumentalities of terrorist states, even where those parties are "separate juridical entit[ies]"). 3) As explained *supra*, the value of the top level domains is not dependent upon ICANN's continued and regular operation of the Root Zone Directory. The Root Zone Directory needs little maintenance or supervision and ICANN's services are thus *de minimis*. 4) Further, ICANNs monopoly over the Root Zone is not innate but is merely tolerated by the operators of the top level domains—they have the capacity to form a competing root zone, minimizing ICANN's role in the operation of their domains.

As the district court tacitly acknowledged, there is no other decision by the District of Columbia Court of Appeals that is remotely on point.[13]

---

[13] Before the district court and in opposition to Plaintiffs' motion to certify a question to the District of Columbia Court of Appeals, ICANN argued that *Shpritz v. Dist. of Columbia*, 393 A.2d 68 (D.C. 1978), supports its position. The district court's omission of *Shpritz* is a telling concession that *Shpritz* is inapposite. *Shpritz*

## II. The District Court's Refusal to Allow Discovery was an Abuse of Discretion

In general, district courts have "broad discretion to manage the scope of discovery." *SafeCard Servs., Inc. v. S.E.C.*, 926 F.2d 1197, 1200 (D.C. Cir. 1991). But that discretion is not unlimited. When discovery decisions are premised on errors of law, they are deemed "arbitrary" and thus constitute an abuse of discretion. *Tuite*, 98 F.3d at 1415; *Schreiber v. Soc'y for Sav. Bancorp, Inc.*, 11 F.3d 217, 220-21 (D.C. Cir. 1993); *see also Sherrod v. Lingle*, 223 F.3d 605, 610, 612-13 (7th Cir. 2000); *Beil v. Lakewood Eng'g & Mfg. Co.*, 15 F.3d 546, 552 (6th Cir. 1994); *W. Elec. Co. v. Piezo Tech., Inc.*, 860 F.2d 428, 430 (Fed. Cir. 1988).

As explained in the prior section, the district court misinterpreted and misapplied District of Columbia law. In reliance on that erroneous conclusion of law, it denied Plaintiffs' request for discovery as moot. (73) ("Because the Court concludes that [country-code top level domains] may not be attached as a matter of District of Columbia law, there are no factual disputes that require further

---

held that even after a services contract has been satisfied, the money to be paid pursuant to that contract might still not be subject to garnishment where the amount of the payment is "uncertain" because it cannot be "determined by reference to the existence of precise and definite standards." *Shpritz*, 393 A.2d at 70. Rather, *Shpritz* held, to garnish a debt, that debt must be "fixed" and subject only to "mere calculation or computation," rather than "judgment" or "discretion." *Id.* Plaintiffs will not begin to speculate as to how ICANN finds *Shpritz* relevant to the instant litigation.

consideration. Therefore, the Court denies plaintiffs' motion for discovery as moot."). Because the district court tied its discovery decision to an erroneous legal conclusion, its discovery decision is an abuse of discretion and must be reversed.

Further, the district court denied Plaintiffs' request for discovery as to the attached IP addresses without ever discussing the status of those assets or whether they are attachable under District of Columbia law. It held only that "the country code Top Level Domain names at issue may not be attached...[as] they are not property subject to attachment under District of Columbia law." (73). It made no corresponding finding with regard to the IP addresses but nonetheless denied Plaintiffs' request for discovery, even as to the IP addresses. That is an abuse of discretion. *See Lapsley v. Xtek, Inc.*, 689 F.3d 802, 809 (7th Cir. 2012); *Narouz v. Charter Commc'ns, LLC*, 591 F.3d 1261, 1266 (9th Cir. 2010).

### III. Remand Requires only that D.C. CODE § 16-544 *Might* Permit Attachment of the Judgment Debtor's Internet Assets

The district court held, in categorical fashion, that "the country code Top Level Domain names at issue...are not property subject to attachment under District of Columbia law." (73). If this Court concludes that those assets *or* the attached IP addresses (that were never addressed by the district court) *might* be attachable under District of Columbia law, depending upon what is learned during discovery, the district court's decision must be vacated and the case remanded for discovery.

Accordingly, it is not necessary for this Court to now decide whether the attached assets are intangible property, service contracts, or some other construct. All that it must decide is whether those assets could plausibly be found to be some form of asset recognized by D.C. CODE § 16-544 and thus attachable under District of Columbia law.

### IV. The District of Columbia Court of Appeals Should Have the Opportunity to Opine on these Important Questions of First Impression under District of Columbia Law

Pursuant to Fed. R. App. P. 27 and D.C. CODE § 11-723, Plaintiffs respectfully request[14] that this Court certify to the District of Columbia Court of Appeals the following question:

> Whether D.C. CODE § 16-544, which provides that a judgment creditor may attach the "goods, chattels, and credits" of the judgment debtor, permits or might permit (dependent on what is revealed in discovery) a judgment creditor to attach top level domain names and IP addresses of its judgment debtor?

In light of the fact that the parties have not yet engaged in discovery, and the District of Columbia Court of Appeals will likely find it difficult or impossible to accurately

---

[14] Plaintiffs initially requested certification by motion dated May 29, 2015. On August 6, 2015, a motions panel ordered that Plaintiffs' motion be referred to the merits panel.

-44-

classify the attached Internet assets, it is advisable to certify an additional important predicate question:

> What types of property, property interests, or other expectancies (including expectancies deriving from non-speculative, non-contingent contractual rights) are attachable pursuant to D.C. CODE § 16-544?

This appeal demands that some court resolve whether D.C. CODE § 16-544 might permit attachment of the top level domain names and IP addresses of the judgment debtors. Because § 16-544 has been so seldom construed—indeed, prior to this case, it was cited by just one published opinion, *United States v. Thornton*, 672 F.2d 101, 104 n.7 (D.C. Cir. 1982), in a footnote and only for the purpose of reciting *all* of the District of Columbia's statutes governing "Attachment and Garnishment After Judgment in Aid of Execution"—this Court would have little to guide it were it to attempt to resolve this important question of first impression.

D.C. CODE § 11-723 permits this Court to certify questions of law to the D.C. Court of Appeals. It is patently applicable in this case and, Plaintiffs submit, should be utilized. As this Court explained:

> We are mindful that a "federal court...should normally decline to speculate on... a question of local doctrine." *East v. Graphic Arts Indus. Joint Pension Trust*, 107 F.3d 911, 911 (D.C.Cir.1997).... In deciding whether to certify such a question to the District of Columbia Court of Appeals, we ask whether District of Columbia law is "genuinely uncertain" with respect to the dispositive question, *Dial A Car, Inc. v. Transp., Inc.*, 132 F.3d 743, 746 (D.C.Cir.1998)..., and whether the case "is one of extreme public importance," *id...* Where there is a

-45-

"discernable path for the court to follow," we do not avoid deciding the question. *Id.*

District of Columbia law presents no such path in this case, and, while the scope of the pollution exclusion clause has been the subject of extensive litigation in other jurisdictions, we can find no common ground of opinion among the courts that have construed the clause. Finally, the question is one of significant import to the public. Because the pollution exclusion clause appears in the standard commercial comprehensive general liability policy, it potentially affects the insurance coverage of most businesses in the District of Columbia. *See*, *e.g.*, *Doerr v. Mobil Oil Corp.*, 774 So.2d 119, 123 n. 1 (La. 2000) ("Some form of this pollution exclusion is part of the standard [commercial general liability] policy purchased by almost all large and small businesses since the mid-1980s.") (citation omitted).

*Nationwide Mut. Ins. Co. v. Richardson*, 270 F.3d 948, 950 (D.C. Cir. 2001) (paragraph break added); *see also Schuchart v. La Taberna Del Alabardero, Inc.*, 365 F.3d 33, 34 (D.C. Cir. 2004) (reiterating that "it would be inappropriate for this court to speculate on a matter of 'local doctrine[.]'").

The elements outlined in *Nationwide* are all satisfied. Whether D.C. CODE § 16-544 reaches intangible property such as the IP addresses and top level domain names described in the writs of attachment is certainly a question of "local doctrine" about which District of Columbia law is "genuinely uncertain" and offers no "discernable path for the court to follow." It is also a question about which there exists a difference of opinion. Indeed, most courts to consider related questions have resolved those questions in line with the Plaintiffs' reasoning here. *See*, *e.g.*, *Kremen*,

-46-

337 F.3d at 1030 (domain names are attachable intangible property under California law); *Office Depot*, 596 F.3d at 701-702 (holding that judgment debtor's domain name may be transferred to receiver to aid in execution of judgment in California); *Sprinkler Warehouse*, 859 N.W.2d at 531 (a domain name is subject to attachment by garnishment under Minnesota law) (review granted (Apr. 28, 2015)). And determining whether victims of terrorism may satisfy their judgments by attaching intangible Internet assets, such as top level domain names and IP addresses, is quite obviously a question "of significant import to the public."

Accordingly, Plaintiffs respectfully submit, this Court should refrain from resolving the meaning of § 16-544 and, instead, ask the District of Columbia Court of Appeals to do so.

## <u>CONCLUSION</u>

For the reasons set forth herein, the order of the court below should be vacated and this case remanded with instructions to conduct discovery.

Dated: Baltimore, Maryland
        August 27, 2015

Respectfully submitted,

THE BERKMAN LAW OFFICE, LLC
*Attorneys for Plaintiffs-Appellants*

by: _____
    Meir Katz

Robert J. Tolchin, Esq.
Meir Katz, Esq.
111 Livingston Street, Suite 1928
Brooklyn, New York 11201
(718) 855-3627
RTolchin@berkmanlaw.com
MKatz@berkmanlaw.com

RAINES FELDMAN, LLP
Steven T. Gebelin
Scott M. Lesowitz
9720 Wilshire Boulevard, Suite 500
Beverly Hills, California 90212
310-440-4100
sgebelin@raineslaw.com

-48-

## CERTIFICATE OF COMPLIANCE PURSUANT TO RULE 32(a)(7)

Pursuant to Rule 32(a)(7) and Circuit Rule 32(a)(1) of the Rules of this Court, I certify that this brief contains 10,955 words. This word count was made by use of the word count feature of Microsoft Word, which is the word processor program used to prepare this brief. This word count includes the whole brief from the jurisdictional statement through the conclusion, including footnotes.

Dated:      Baltimore, Maryland

             August 27, 2015

                          /s/ Meir Katz

                      Meir Katz

# STATUTORY ADDENDUM


## Table of Contents

28 U.S.C. § 1610(g) ................................................................ a3

TRIA § 201 (codified at 28 U.S.C. § 1610 note) ............................... a3

D.C. CODE § 16-544 ............................................................. a5

CAL. CIVIL PROCEDURE CODE § 695.010 ........................................... a5

CAL. CIVIL PROCEDURE CODE § 699.710 ........................................... a5

MINN. STAT § 571.73, subd. 3(3) ............................................... a5

VIRGINIA CODE § 8.01-474 ...................................................... a6

VIRGINIA CODE § 8.01-478 ...................................................... a6

VIRGINIA CODE § 8.01-511 ...................................................... a6

## 28 U.S.C. § 1610(g) – Property in certain actions

(1) **In general.—** Subject to paragraph (3), the property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section, regardless of—

    (A) the level of economic control over the property by the government of the foreign state;

    (B) whether the profits of the property go to that government;

    (C) the degree to which officials of that government manage the property or otherwise control its daily affairs;

    (D) whether that government is the sole beneficiary in interest of the property; or

    (E) whether establishing the property as a separate entity would entitle the foreign state to benefits in United States courts while avoiding its obligations.

(2) **United States Sovereign Immunity Inapplicable.—**
Any property of a foreign state, or agency or instrumentality of a foreign state, to which paragraph (1) applies shall not be immune from attachment in aid of execution, or execution, upon a judgment entered under section 1605A because the property is regulated by the United States Government by reason of action taken against that foreign state under the Trading With the Enemy Act or the International Emergency Economic Powers Act.

(3) **Third-Party Joint Property Holders.—**
Nothing in this subsection shall be construed to supersede the authority of a court to prevent appropriately the impairment of an interest held by a person who is not liable in the action giving rise to a judgment in property subject to attachment in aid of execution, or execution, upon such judgment.

## TRIA § 201 (codified at 28 U.S.C. § 1610 note) – Satisfaction of judgments from blocked assets of terrorists, terrorist organizations, and state sponsors of terrorism

    (a) **In General.—** Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605A or 1605(a)(7)

(as such section was in effect on January 27, 2008) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable. * * *

(d) **Definitions.**—In this section, the following definitions shall apply:

(1) **Act of terrorism.**—The term 'act of terrorism' means—

(A) any act or event certified under section 102(1)...; or
(B) to the extent not covered by subparagraph (A), any terrorist activity (as defined in section 212(a)(3)(B)(iii) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(iii))).

(2) **Blocked asset.**—The term 'blocked asset' means—

(A) any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act (50 U.S.C. App. 5(b)) or under sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701; 1702); and

(B) does not include property that—
(i) is subject to a license issued by the United States Government for final payment, transfer, or disposition by or to a person subject to the jurisdiction of the United States in connection with a transaction for which the issuance of such license has been specifically required by statute other than the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) or the United Nations Participation Act of 1945 (22 U.S.C. 287 et seq.); or
(ii) in the case of property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations, or that enjoys equivalent privileges and immunities under the law of the United States, is being used exclusively for diplomatic or consular purposes. * * *

(4) **Terrorist party.**— The term 'terrorist party' means a terrorist, a terrorist organization (as defined in section 212(a)(3)(B)(vi) of the Immigration and

Nationality Act (8 U.S.C. 1182(a)(3)(B)(vi))), or a foreign state designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)) or section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371).

## D.C. CODE § 16-544 – Property subject to attachment

An attachment may be levied upon the judgment debtor's goods, chattels, and credits.

## CAL. CIVIL PROCEDURE CODE § 695.010 – Property subject to enforcement generally

**(a)** Except as otherwise provided by law, all property of the judgment debtor is subject to enforcement of a money judgment.

## CAL. CIVIL PROCEDURE CODE § 699.710 – Property subject to enforcement of money judgment subject to levy

Except as otherwise provided by law, all property that is subject to enforcement of a money judgment pursuant to Article 1 (commencing with Section 695.010) of Chapter 1 is subject to levy under a writ of execution to satisfy a money judgment.

## MINN. STAT § 571.73, Subd. 3(3) – Property attachable

**Property attachable.** Subject to the exemptions provided by sections 550.37 and 571.922 and any other applicable statute, the service of a garnishment summons under this chapter attaches:

* * *

**(3)** all other nonexempt intangible or tangible personal property of the debtor in the possession or under the control of the garnishee at the time of service of the garnishment summons, including property of any kind due from or in the hands of an executor, administrator, personal representative, receiver, or trustee, and all written evidences of indebtedness whether or not negotiable or not yet underdue or overdue[.] * * *

## VIRGINIA CODE § 8.01-474 – What writ of fieri facias to command

By a writ of fieri facias, the officer shall be commanded to make the money therein mentioned out of the goods and chattels of the person against whom the judgment is.

## VIRGINIA CODE § 8.01-478 – On what property writ of fieri facias levied; when lien commences

The writ of fieri facias may be levied as well on the current money and bank notes, as on the goods and chattels of the judgment debtor, except such as are exempt from levy under Title 34, and shall bind what is capable of being levied on only from the time it is actually levied by the officer to whom it has been delivered to be executed.

## VIRGINIA CODE § 8.01-511 – Institution of garnishment proceedings

On a suggestion by the judgment creditor that, by reason of the lien of his writ of fieri facias, there is a liability on any person other than the judgment debtor or that there is in the hands of some person in his capacity as personal representative of some decedent a sum of money to which a judgment debtor is or may be entitled as creditor or distributee of such decedent, upon which sum when determined such writ of fieri facias is a lien, a summons in the form prescribed by § 8.01-512.3 may (i) be sued out of the clerk's office of the court from which an execution on the judgment is issued so long as the judgment shall remain enforceable as provided in § 8.01-251, (ii) be sued out of the clerk's office to which an execution issued thereon has been returned as provided in § 16.1-99 against such person, or (iii) be sued out of the clerk's office from which an execution issued as provided in § 16.1-278.18. * * *